BARNHILL, J., concurring in part and dissenting in part.
This is an action brought by plaintiff against the defendant in the Forsyth county court, to recover a certain piece of land, some 6.23 acres and a 30-foot road, on the south side of County Club Road, near the city of Winston-Salem, N.C. Henry F. Burke and wife, Eugenia Burke, the grandfather and grandmother of plaintiff, on 28 April, 1916, deeded her the above mentioned land as a gift and deeded the adjoining tract to plaintiff's sister, Mrs. C. C. Disher, as a gift. The defendant built a house on his wife's lot. Plaintiff's husband, T. E. Ebert, built a house on her lot and the two sisters and their husbands lived side by side.
The following indicates the controversy, in part: The plaintiff offers in evidence the following portion of paragraph one of the further defense of the defendant's answer:
"That he is advised, informed and believes that the property mentioned in the complaint was mortgaged to the Security Life Trust Company; that said mortgage was in arrears and that the Security Life Trust Company foreclosed the mortgage on the property in question and purchased same at said foreclosure sale.
"And the defendant avers that he agreed to execute his note in the sum of $6,000.00 and pay whatever was due the Security Life Trust Company, and hold said property for the benefit of the plaintiff, and the plaintiff was to pay him the difference between the amount he had advanced in excess of the note of $6,000.00 at $20.00 a week, and to pay said note according to its tenor.
"The plaintiff offers in evidence the following portion of paragraph 6 of the amendment to the answer of the defendant:" `That in connection with the action of the defendant in purchasing the property from the Security Life Trust Company in order to assist the plaintiff to save her home after the foreclosure sale in October, 1929, it was agreed between the plaintiff and defendant that the defendant would purchase said property from the Security Life Trust Company and would pay the Security Life 
Trust Company the amount due said company by the plaintiff; that the defendant did purchase said property and received the deed for said property and paid the Security Life Trust Company the sum of $699.42 cash and executed a note for $6,000.00, secured by a deed of trust on the lands formerly owned by the plaintiff, and that the plaintiff was to repay the defendant the sum of $699.42, together with interest thereon, at the rate of twenty dollars per week, and that it was also agreed that the plaintiff would relieve the defendant from all liability by reason of the execution of said note, secured by the deed of trust to the Security Life Trust Company, in the amount of $6,000.00, before the defendant should convey said property to the plaintiff.' *Page 38 
"The plaintiff offered in evidence the deed book 325, at page 66, from the office of the register of deeds of Forsyth County, being record of deed dated the 23rd day of April, 1930, from George A. Grimsley, Trustee, to C. C. Disher, covering the real property referred to and described in the complaint.
"The plaintiff offered in evidence the following instruments, the execution of which was admitted by the defendant, and which is Plaintiff's Exhibit #1: `This agreement, made and entered into this 3rd day of September, 1938, by and between the Security Life Trust Company, of Winston-Salem, North Carolina, and Kate H. Ebert and husband, T. E. Ebert, of Winston-Salem, North Carolina,'" etc.
In the defendant's amended answer is the following: "It was further agreed that if the plaintiff should repay to the defendant money he had advanced in her behalf and relieve the defendant of the obligation of the note in the amount of $6,000.00 and receive from the defendant a deed to the lands formerly owned by her that the defendant would have the right to maintain said dam, drain ditches and terraces so long as the basin should be used for the purpose of a lake or pool; that in reliance upon said agreement the defendant did construct a dam and did develop upon the property partly belonging to him and partly upon the lot formerly owned by the plaintiff a lake or pool; that the said lake was completed pursuant to said agreement, said drain ditches and terraces were built in accordance with said agreement, and that the defendant has expended large sums of money in the development of said lake and in the maintenance thereof; that he has built upon said property a concrete dam, also a stone wall, laid out terraces and drain ditches and made other improvements at great expense, and that said lake was developed in accordance with the agreement above set out; that the plaintiff has made no objection thereto; that by reason of said agreement above set out and by reason of the large sums of money the defendant has in good faith expended in developing said lake, the defendant is entitled to have a decree entered adjudging him to be the owner of an easement in the land covered by the lake or pool and in the appurtenances thereto, including drain ditches, terraces and the land between the terraces and the lake, all of which are necessary for the proper maintenance of said lake; that at the time the defendant agreed to assist the plaintiff in retaining her home and the purchasing of the property from the Security Life Trust Company, as hereinbefore set out, and as a part of said agreement the plaintiff and defendant discussed the matter of sewer and cesspool line, as hereinbefore set out, and also discussed the matter of the defendant's purpose to develop the lake and the pool as hereinbefore set out, which lake and pool the defendant did develop pursuant to said agreement; that the plaintiff and *Page 39 
defendant agreed that if and when the plaintiff, by virtue of her compliance with said agreement, should become entitled to have the defendant convey to her the lot and property formerly owned by her, such conveyance would be subject to the payment of all money advanced and relief from the mortgage indebtedness, and subject to the defendant having an easement and right in and to said sewer line and cesspool hereinbefore set out, and also subject to an easement for the purpose of maintaining said lake and its appurtenances, as set out above; that the plaintiff acquiesced in the action of the defendant in building the said dam and improvements and developing the lake site and has stood by for a number of years and had made no objection thereto, and that the plaintiff has ratified and is now estopped to deny the defendant has an easement and a right to continue to maintain and use said lake and its appurtenances and the sewer lines and appurtenances hereinbefore described. Wherefore, the defendant having fully answered, prays for the relief as set out in his answer filed in this cause; that the court enter a decree adjudging the defendant to be entitled to an easement in and to the sewer line and cesspool on the land formerly owned by the plaintiff, and an easement in and to the lake site, terraces and ditches, and other appurtenances to the lake on the land formerly belonging to the plaintiff, upon a conveyance by the defendant to the plaintiff; and, that the plaintiff pay the costs of this action to be taxed by the clerk; and for such other and further relief as he may be entitled."
The Disher house was built, and, as there was no city water, they dug a well and placed an electric pump in the well. The Eberts had no water and no way of getting same. C. C. Disher testified, in part: "Mr. Ebert at that time did not have any water or any way or getting water, and we agreed that he could get water from our well at a rate of two dollars and twenty-five cents a month, and he was to pay for the water line to run over to his house from our line. I was to pay for my cesspool, or rather, the sewer line from my house to where it went into a `Y' from his house into the main line going into the sewer or cesspool. He was to dig the cesspool and maintain the cesspool and pay for the building of the cesspool on his place. I was to dig my well and maintain the well. We were to pay for the line from the `Y' to the cesspool jointly and I have bills to show it has been paid for jointly. I have been using that sewerage equipment and cesspool since that time, since about 1923. Later I built a fish pond or lake, built a dam where we had a stream of water running in. I had an understanding and agreement with Mrs. Ebert and Mr. Ebert in regard to a lake that we were to establish on the back of this lot if I took up this mortgage, or rather, took over the property, if I bought it and allowed them to take it back. I talked with Mr. Grimsley who, I understood, was the president of *Page 40 
the Security Life Trust Company, and with Mr. C. C. Taylor before having any talk with Mr. Ebert or Mrs. Ebert, and then I came back and talked with Mr. and Mrs. Ebert in regard to it, told them what Mr. Grimsley had agreed to do in regard to deeding the property to me, and I told Mr. and Mrs. Ebert before I ever paid any of this or made any agreement with Mr. Grimsley that I would be willing to take this over, due to the fact that I already had a connection and cesspool over there and a line and had expended some money on that, and provided further that they would allow me, if I took it over, which they agreed on certain conditions to pay me back what I had advanced to them for taking the property over, if they paid me back I was to have that lake as long as it was used, not as long as I used it, but as long as it remained as a lake, it was to be my property. Before I would take the property over or make any payment on it, Mr. and Mrs. Ebert said that I could use the cesspool connection there from then on. There was no definite time set for ever terminating it; that I could continue to use it and that the lake should be mine, belong to our property there as long as it was used for a lake. After this conversation with Mr. and Mrs. Ebert I went to Mr. Grimsley, or rather, to the Security Life 
Trust Company, and gave them my check for $699.42 which represented a considerable amount of past due interest that had accumulated on the mortgage of Mrs. Ebert's prior to the time of their foreclosure. . . . Mr. and Mrs. Ebert have not paid me back all the money I have expended in taking over this property. Neither the plaintiff, Mrs. Ebert, nor Mr. Ebert have tendered me any money to pay me for the money I have expended. They have not relieved me of my obligation of six thousand dollars on the note secured by the deed of trust to the Security Life Trust Company. I am now and have been willing and ready to deed the property back to the plaintiff upon payment to me of the amount due and the use by me of the lake and the sewer line. After I had expended this money in taking over this property and carrying it, I employed Mr. Bryant to go down with a steam shovel and build a dam with a cement core. Before the dam was built we went in with the same steam shovel and dipped out the basin for this lake, made a regular pool out of it down between two hills and cleaned it out. The place where I built the lake was just a mucky bunch of old black-jacks, roots, stumps, nothing but mush mud. After we built a dirt dam with a cement core, we found it wouldn't stand on account of muskrats and things getting through it, and I went down and built a concrete dam clean across the bottom, probably eighty feet in length. Then I built another concrete wall about middleways of the pond, across the pond about thirty-six feet above the original dam and about four or five feet high. The dam at the end is about seven feet high and this second dam *Page 41 
wasn't up to the top of the water; that is, when it fills up to the height of that dam it flows over into the pool below and then fills up to the height of the big dam down below. The second concrete dam was to keep the mud from washing down out of the upper part of the lake or, rather, the upper part of the meadow, down against the first dam. I have this lake stocked with fish. I have built about 2,300 square feet of rock wall along the side of the lake, around the edge of the lake, as a retaining wall to keep the water from running into the lake. I cut a drainage ditch above the lake. . . . I have spent about twenty-five hundred to three thousand dollars on the lake and the cabin that I built and the walls and all. That lake has been in operation since the time it was built in 1930. Mr. and Mrs. Ebert's children use the lake, go in swimming often. Mrs. Ebert has brought them down and sat and watched them while they were playing in the water. Mr. Ebert was down there several times while the lake was being built and Mrs. Ebert was down there a couple of times, I don't know how many, but I noticed her there a couple of times while it was being built. I had a rock wall built around the spring down there, built up around it, a concrete floor in it and rock steps down to it. We built a very nice cabin which is used for picnic and gatherings, also for changing clothes for bathing and to sit around in, as a pleasure house. Mr. and Mrs. Ebert never made any complaint to me until a short time ago about this lake. The lake has been as it is now since 1931, I think. I think it was completed in 1931, and has been there ever since. The sewer and water connections have been in use since 1923, and are being used now. I am still furnishing Mr. and Mrs. Ebert water. . . . I had to have the first pump which I installed in the well overhauled three or four different times. Then I have had to buy a new pump and had to keep that one up, and I have to pay the current for pumping the water each month. Then I have had to have the well cleaned out, as I ordinarily would. I pay for the electric current rent for operating the pump. . . . The spring that I spoke of having walled in and put a concrete floor in is on Mrs. Disher's land. The cabin that I built is on Mrs. Disher's land. The rock wall that was built is on Mrs. Disher's land. The concrete wall in the pool is partly on Mrs. Disher's land and partly on Mrs. Ebert's land. There are two concrete walls or dams in this lake. I hadn't heard any complaint about the lake from the Eberts up to the time of the filing of the complaint in this action. I have heard some complaint since that time. . . . The land where we reside was conveyed to my wife by her grandfather and grandmother and the land adjoining where Mrs. Ebert resides was also conveyed to her by her grandfather and grandmother. My wife's property has been held continuously by her since the time it was conveyed to her by her *Page 42 
grandfather and grandmother. At the time the cesspool was built and the well dug and the pump installed in the well, my wife was the owner of the property. I paid for the erecting of the house in which we live on my wife's lot and I paid for the digging of the well, and the pump, and the equipment that went into it. I paid for the sewer pipe and line connecting my house with the sewer line from the `Y' to the cesspool on Mrs. Ebert's place, the place that she formerly owned, and I think Mr. Ebert paid me back his part of it. I paid for the improvements at the spring and the erection of the lake on my wife's land and the land formerly owned by Mrs. Ebert and now in my name."
Mrs. C. C. Disher testified, in part: "The lot upon which we live was deeded to me by my grandfather, Henry Burke. After the property was deeded to me a house was built on it and we moved there. Mr. Disher's money went into the erection of the house on this lot. The matter of the well and the sewer was discussed with my sister and her husband two or three different times. Mr. Disher and I discussed this when they were talking about him taking over the property. Mr. Disher was to dig the well; Mr. Ebert was to dig the cesspool. That was done about 1923, when we moved out there. A long time after that there was a dam built back there on the property. That was in 1931. Prior to that time Mrs. Ebert's property had been sold by the Security Life Trust Company under a mortgage. I heard a conversation between Mrs. Ebert and my husband about him paying the amount of the mortgage and taking the property over. They were to pay that back at $20.00 a week. Mr. Disher told Mr. and Mrs. Ebert that he was willing to take the property over and help them with it, and Mr. and Mrs. Ebert agreed to pay Mr. Disher $20.00 a week on this property and the cesspool was to remain and the lake was to remain just like it was. Mr. Ebert was to pay the amount of the indebtedness that Mr. Disher assumed. Mrs. Ebert came down to the lake when it was being built and after it was built continued to come down there. In the summertime the children would go every day and go in the water and Mrs. Ebert would come down. During the last two months, when Mr. Ebert would go to work, the children would slip off down there and go in. Before that they would go just any time of day they wanted to. The dam was built in 1931. I think it was started in the summertime or maybe in the early spring. The arrangement for my husband to take up the debt to the Security Life Trust Company was made in 1930. We saw Mr. and Mrs. Ebert over at their house about that matter. There wasn't a day in the week but what I was over there and they were at my house, or she was. Mr. Ebert was present when the arrangement was made between my husband and Mrs. Ebert and I was present. If I am not mistaken, that was in our back yard one day about noon. As *Page 43 
I said, this was discussed more than one time. We talked about it two or three times over at Mrs. Ebert's house when she and Mr. Ebert were both there. I know Mr. Disher was to take the property but I don't know as to just what he was to pay. They were to pay him $20.00 a week on the indebtedness after he took the property over, and that was for the obligation he had undertaken with the Security Life Trust Company. The conversations concerned taking over the property and the cesspool and the lake. What was said in the conversations was that the cesspool was to remain like it was and the swimming pool was to remain as it was so long as it was used as it was. I heard a discussion between Mrs. Ebert and Mr. Disher about the fish pond before Mr. Disher took the property, along about the same time they were talking about him taking it over. There weren't any fish in it but there was a lake there at the time. No, there was no lake there when he took over the property. There was just an old marshy place down there."
T. E. Ebert, husband of plaintiff, testified, in part: "I am the husband of Mrs. Kate Harrison Ebert and am a foreman at Reynolds Tobacco Company. I was present when the arrangement was made between Mr. Disher and my wife about his assisting her in the financing of a debt to the Security Life 
Trust Company. That arrangement was discussed with Mr. Disher one time in our house and one time in his place of business which was on the south end of Cherry Street. He was running a place of business there and it was discussed there one time between him and me. At the time of those discussions the cesspool was already constructed and there was no mention during the negotiations of the cesspool. At the time there was no pool or pond on the property. I do not recall the exact date that the fish pond or pool was built on the property, but the best I can recollect it was in or near the year of 1933. I haven't any way to check that except my memory. During the negotiations between Mr. Disher and my wife with reference to him rendering her assistance or financing the indebtedness no reference or mention was made to any fish pond or lake. The well and the cesspool were both constructed after Mrs. Disher and Mrs. Ebert owned the properties. Mrs. Disher owned at that time the property she still owns and where she and her husband live, and Mrs. Ebert owned at that time the property where she and I live now which is the property described in this suit as now in the name of Mr. Disher. I have made complaints about the lake. I spoke to those colored people Mr. Disher mentioned — that is, I didn't make any complaint, but they were complaining to me. I have made complaints about the mosquitoes. We fight mosquitoes there half the night. This Mr. Snotty that lives on Mr. Disher's place, I told him the damn thing ought to come out of there; that from the middle dam up it's a regular mosquito hole, no *Page 44 
doubt about it, bulrushes up in it and a considerable amount of hog manure been washed in there from a hog pen a year or so back which still lies there, and that's why I have complained. I have not complained directly to Mr. Disher. There are weeds all around the upper side of the pond as high as my head, on the north side, on our piece of property. There was no arrangement at all between Mr. Disher and Mrs. Ebert about the lake, as I know of. It was discussed between me and Mr. Disher probably six months before it was built. I couldn't say just the date of that conversation. Mr. Disher wanted me to go in with him and build the pond and I couldn't do it. I told him I couldn't. wasn't able to. It was discussed at that time as a fish pond, and he discussed how he ought to build it, how the dam ought to be built. That was after Mr. Disher had taken the property over. Just an ordinary dirt dam was what he built first."
Judgment was rendered in the Forsyth county court, as follows: "This cause coming on to be heard, and being heard, before the undersigned judge of the Forsyth county court, at the September 12th Term, 1938, and it appearing to the court that the plaintiff alleges in substance that the defendant held the property conveyed to him by Geo. A. Grimsley, Trustee, recorded in deed book 326, page 66, in the office of the register of deeds for Forsyth County, in trust for the plaintiff, to permit the plaintiff to redeem said land upon the condition that the plaintiff would pay to the defendant any and all indebtedness which the defendant had incurred and paid in connection with a loan on said property, together with interest on the same at the rate of six per cent per annum from the date paid until repaid; and it further appearing to the court that the defendant admits said allegations in his pleadings, and that there is a dispute between the parties as to the amount that has been paid by the defendant on behalf of the plaintiff in connection with said loan, which dispute has been referred to T. Hardin Jewett, Esq., referee, for the purpose of determining said amount: Now, therefore, it is ordered and adjudged that the plaintiff pay to the defendant such an amount as shall be determined to be owing by the plaintiff to the defendant by said referee, and that such amount shall be paid into the office of the clerk of the Superior Court within five days after the filing of the referee's report, and that the plaintiff shall relieve the defendant of any and all liability incurred by reason of the defendant having executed a note or notes to the Security Life Trust Company, secured by a deed of trust on said property, and upon the plaintiff paying said indebtedness and relieving the defendant of such liability that the defendant shall forthwith convey to the plaintiff the property described in the deed from George A. Grimsley, Trustee, to C. C. Disher. It is further considered, ordered and adjudged that the said C. C. Disher holds said property in *Page 45 
trust for the plaintiff, which said trust shall be terminated by the plaintiff complying with the conditions hereinbefore set out and upon said compliance that the defendant shall reconvey said property to the plaintiff. It is further considered, adjudged and ordered that the costs of this action be taxed by the clerk, one-half against the plaintiff and one-half against the defendant. And this cause is retained for further orders. Oscar O. Efird, Judge of Forsyth county court."
To the signing of the foregoing judgment, the defendant excepted, assigned error and appealed to the Superior Court.
On appeal to the Superior Court, the following exceptions and assignments of error also were made by defendant:
"1. For that the court erred in admitting in evidence the contract executed between the Security Life Trust Company and Kate H. Ebert and husband, T. E. Ebert.
"2. For that the court erred in signing an order for a reference as appears of record.
"3. For that the court erred in refusing to grant the defendant's motion for judgment as of nonsuit at the close of the plaintiff's testimony.
"4. For that the court erred in refusing to allow the defendant to show the amount of money he had advanced to the plaintiff, as follows: `Q. I hand you another check here, dated October 26, 1931, payable to Security Life Trust Company, for $180.00. What was that check for? (Objection; sustained.) The court: I think you have gone into this far enough. Mr. Hastings: I have a number of other checks I would like to get in the record, what those checks are that make up the account. Q. I hand you here a paper. I ask you to state to his Honor and the jury how much money you have paid on account of taxes, on account of this note to the Security Life Trust Company, and the money you have actually expended on this property by virtue of taking it over, as you have testified to. (Objection; sustained.)'
"5. For that the court erred in refusing to allow the witness R. G. Wilmoth to testify as to the amount of indebtedness due by the plaintiff on said property, as follows: `Q. How much is he behind in his interest, if any? (Objection; sustained.) Witness would answer, if allowed, $770.00.'
"6. For that the court erred in permitting the witness R. G. Wilmoth to testify on cross-examination, as follows: `Q. Was that a condition of the loan? Ans.: Yes, sir.'
"7. For that the court erred in permitting and authorizing judgment as of nonsuit as to the defendant's further defense and cross-action, as follows: `The court: Let the record show that at the conclusion of the defendant's evidence the plaintiff moved for judgment as of nonsuit as to the defendant's further defense.' *Page 46 
"8. For that the court erred in signing the judgment as appears of record."
The judgment of Clement, J., in the Superior Court, was as follows: "This cause coming on to be heard upon appeal from the Forsyth county court, and being heard before the undersigned judge of the Superior Court at the March 20, 1939, Term upon the record and case on appeal and argument of counsel, and the court being of the opinion that the assignments of error, Nos. 1, 3, 4, 5, 7, and 8 should be sustained, and that assignments of error Nos. 2 and 6 should be overruled; and the court being further of the opinion that this cause should be remanded to the Forsyth county court for a new trial upon the defendant's counterclaim or cross-action; and the parties through counsel have, by consent, agreed that this judgment may be signed out of term as of the term which expired April 1st, 1939: It is, therefore, ordered and adjudged that assignments of error Nos. 1, 3, 4, 5, 7, and 8 be and the same are hereby sustained; that assignments of error Nos. 2 and 6 be overruled; and that this cause be remanded to the Forsyth county court for trial upon the defendant's counterclaim or cross-action in accordance with this judgment; and that the plaintiff pay the costs of this appeal, to be taxed by the clerk. This judgment is signed and entered nuncpro tunc as of the March 20th Term, 1939, of the Superior Court of Forsyth County. This the 6th day of April, 1939. J. H. Clement, Judge Superior Court."
The plaintiff excepted and assigned error to the signing of the judgment and also to the six exceptions and assignments of error made by defendant which the court below sustained. The plaintiff contends that she had complied in all respects with the agreement made with defendant and a deed should be made to her.
Although the statement of facts are prolix, from the exceptions and assignments of error and the record, we gather that there is no dispute as to the "signing an order for a reference as appears of record." The main controversy, as we understand it: When plaintiff complies with her agreement with defendant in relieving him of his obligation to the Security Life Trust Company, and the deed is made to her, provision be made in the deed as set forth in defendant's amended answer "subject to the defendant having an easement and right in and to said sewer line and cesspool and also subject to an easement for the purpose of maintaining said lake." Further, the question may arise as to the right of defendant to have a recovery for money had and received. *Page 47 
Several questions of law arise on the exceptions and assignments of error in the record. The plaintiff moved for judgment as of nonsuit on defendant's further defense, which was granted by the Forsyth county court and overruled by the Superior Court. Under this exception and assignment of error plaintiff contends that the defense set up was an easement and must be in writing.
N.C. Code, 1935 (Michie), sec. 988, is as follows: "All contracts to sell or convey any lands, tenements or hereditaments, or any interest in or concerning them, and all leases and contracts for leasing land for the purpose of digging for gold or other minerals, or for mining generally, of whatever duration; and all other leases and contracts for leasing lands exceeding in duration three years from the taking thereof, shall be void unless said contract, or some memorandum or note thereof, be put in writing and signed by the party to be charged therewith, or by some other person by him thereto lawfully authorized."
A permanent right to overflow land by the erection and maintenance of a mill dam cannot be created by parol. Bridges v. Purcell, 18 N.C. 492. The doctrine which prevails in many states, that a part or even a full performance of the stipulation of an unwritten agreement for the disposition of an interest in land exempts such agreement from the operation of the Statute of Frauds, is not recognized in this State under this section which declares such agreements to be void and of no effect.Kivett v. McKeithan, 90 N.C. 106 (108); Ellis v. Ellis, 16 N.C. 342. In such a case, however, the party who has advanced the purchase price or has made improvements shall be refunded his advances. Kivett v. McKeithan,supra; Barnes v. Brown, 71 N.C. 507; Luton v. Badham, 127 N.C. 96;Smithdeal v. McAdoo, 172 N.C. 700 (703).
In Justice v. Baxter, 93 N.C. 405 (409), it is said: "It is in just such contingencies, when the ameliorating work has been done bona fide and under the honest belief of having title, that the statute interposes and says to the true owner, you are entitled to your land, but it is inequitable for you with it to take the enhance value of the expenditure and labor of another honestly put upon it."
A party may rely on the Statute of Frauds under the general issue or a general denial. Luton v. Badham, 127 N.C. 96; Winders v. Hill, 144 N.C. 614. A denial of the contract as alleged is equivalent to a plea of the statute. McCall v. Institute, 189 N.C. 775.
In Kivett v. McKeithan, supra, it is said: "We do not recognize the doctrine which prevails in many of the states, that a part or even a full performance of the stipulation of an unwritten agreement for the disposition of an interest in lands, other than a lease not enduring more than three years (The Code, sec. 1743), exempts such agreement from the operation of a statute which declares it `shall be void and of no *Page 48 
effect' (sec. 1554), while in such case we compel the restoration of moneys paid under it, and perhaps allow compensation for what has been expended and cannot be restored to the extent of the value of the benefit which the other party receives and appropriates to his own use."
In Elliott on Contracts, Vol. 2, p. 511, sec. 1271, is the following: "How contract concerning land may be taken out of the statute. If the parol agreement is clearly and satisfactorily proven, and the plaintiff, relying upon such agreement and the promise of the defendant to perform his part, has done some act or acts of performance on the faith of the contract and to the knowledge of the defendant, a court of equity may decree specific performance, when it would be a virtual fraud to allow the defendant to interpose the statute as a defense and at the same time secure to himself the benefit of what has been done in performance."
In Avery v. Stewart, 136 N.C. 426 (434), we find: "A mere parol agreement to convey land to another raises no trust in the latter's favor and comes within the provisions of the statute of frauds. Campbell v.Campbell, 55 N.C. 364. Our case is not of that kind. There are other elements present which are of an equitable character and affect the conscience of the defendant." O'Briant v. Lee, 214 N.C. 723.
N.C. Code, supra, sec. 456, is as follows: "All persons may be made defendants, jointly, severally, or in the alternative, who have, or claim, an interest in the controversy adverse to the plaintiff, or who are necessary parties to a complete determination or settlement of the questions involved," etc. This section contemplates that all persons necessary to a complete determination of the controversy, the matter in litigation, and affected by the same in some way, as between the original parties to the action, may, in some instances, and must in others, be made parties plaintiff and defendant.
It appears from the pleadings and evidence that Mrs. C. C. Disher was the former owner of the land in controversy adjoining plaintiff's land, and on which the water and sewerage system and lake were built. She may have certain rights for a complete adjustment of the controversy and should be made a party to the action. The questions of law and fact arising on this record are intriguing and intricate.
Modified and affirmed.